I'd like to reserve five minutes for rebuttal. Whatever you've got left on the clock is yours. Fair enough, Your Honor. If you're going to negative numbers, it's at my mercy. I'm sure I am anyway. May it please the Court. I'd like to move for appellant Stephanie Gambini. He got a point. Give this man an extra 30 seconds. Thank you, Your Honor. If the laws against disability discrimination mean anything, it means that an employer cannot cave to the fears of coworkers about a disabled employee. Without consulting a single medical professional, DeVita fired Stephanie Gambini 10 days after she suffered a bipolar episode at work that frightened her coworkers. She did not pose a direct threat to anyone. DeVita committed disability discrimination. They did not dismiss her for threat. I mean, they were very careful at trial not to rely on threat as the reason. And I realize you sort of want to get in this instruction about the threat defense, but they didn't raise the threat defense. What they said is, look, we have a policy and, you know, we're allowing teamwork, which means sort of goodwill and all of that, and one of the policies is you don't cuss out other people you work with. And I mean, that's colloquial, but that's basically what the policy is. And she violated that policy, and, you know, we can't allow that. I disagree with that in part. I agree that they tried to run away from their interrogatory answer, which was the only sworn testimony at trial with anyone with personal knowledge of the reasons for the termination. None of the other witnesses that testified for DeVita at trial were the decision-maker. None of the others. They did not call the decision-maker Ms. Lideau, who had signed the interrogatory answer. And as this Court has said many times, it's the motives of the decision-maker that is at issue, not the people that might have had input into the decision. So the only sworn evidence at trial as to why they took this action was the interrogatory answer, and it specifically says one of two or three reasons there was that she frightened her coworkers, as documented in the e-mails. Second, Your Honor, they clearly did this as a workplace safety case. Okay. Let me just slow down just so I understand. I mean, let's say that is one of the reasons. Yes. They have two or three reasons, right? And I'm asking the question just so I understand where we go with this line of argument. And they say, look, we have two or three reasons. We're not going to rely on the one reason, which is threat, for whatever reasons. We don't think it can prove it. We think it causes us legal problems, whatever. But we do have these other reasons, and one of the reasons is we have a policy. We have a policy, and we rely on this policy. And, you know, you haven't been able to show any instance where somebody has used that kind of language and been allowed to continue working. Why can't they make that decision, say, even though we may factually have had more than one reason, we choose to rely legally at trial on the one reason? Why can't they do that? Because the reason they relied on was an illegal reason. And under Washington law, which in this respect is quite different than federal law, there is no same-action defense. That is critical. As long as one illegal reason infects the decision-making process under Washington law, that is discrimination as a matter of law. And so you can't run away from your illegal reason saying, we choose not to rely on the actual illegal reason we relied on. Second, Your Honor, there was – they didn't rely – this has nothing to do with just the fact that she said the F word. There was plenty of evidence that lots of other people used the F word. They portrayed this as a workplace violence case, that this was someone who was going to be a violent person in the workplace. If you have a – it's not – obviously, we all want to protect against violence in the workplace. But that has to be based on fact. Okay. Slow down. Let's be fair to the other side, because you – they said – it wasn't the F word. I mean, it was the fact that she used the F word, that she threw a piece of paper at her supervisor. I mean, throwing things at people is – sure, you can do anything. You can throw a paper airplane at a coworker in jest. But when done in anger, throwing things contains a level of subordination and being out of control. That's really quite different from just using the F word by itself. And thus, using the F word in anger. And then she slams the door. And then there's testimony, which is disputed, but which could have been credited. And then she says, you'll be sorry for this. Right. And if, Your Honor – and the difference between this and any other employee is this conduct was caused by a disability. And the law is very clear in this circuit, in the Ninth Circuit, that conduct – misconduct caused by a disability is treated legally as the same as a disability and not as a separate basis of termination. And the Washington court – in the real – the Washington Supreme Court has chosen to follow this circuit's approach. The circuit said that in Humphrey. It reemphasized it this summer in the Dart case. And the Washington Supreme Court in the real case said we follow that approach. So when you're dealing with a disabled employee, you can't treat them the same as any other person. The U.S. Supreme Court in Barnett said that disabled employees get to violate certain rules that other people are held to. Disability law tells us when you can nevertheless take action against those employees. And if, in fact, it is a safety issue, the employer – there must be evidence of direct threat. If it's a non-safety issue, then it must be business necessity. They never even argued a business necessity defense. It has to be a qualification that is both job-related and business necessity. And so, in fact, a general policy about insubordination – you can't use the F word – would indeed be discriminatory. And the EEOC has so stated, for example, if someone had a Tourette syndrome, is that the – I was going to ask you about just that. If somebody had a Tourette syndrome, would that really be different from your client's position because Tourette's is really not, in that sense, controllable, whereas in your client's case, there's a shift in medication that's at issue and, therefore, the episode that caused – should have had an opportunity to cure, is that sort of your position? No, I think it's exactly the same as the Tourette syndrome. I mean, medication was part of her treatment for bipolar condition. This is part of what happens with disabling conditions. You get treatment. You get medicated. What happened on July 11th is, unfortunately, what happens with bipolar employees sometimes, and it's particularly likely when there's a shift in medication. It's not her fault that the earlier medication didn't work. And so a general insubordination policy cannot be applied to a person whose conduct that violates the policy is caused by the disability. And it's undisputed in this case that what happened on July 11th was caused by the disability. There was literally no evidence to the contrary. And so, again, the whole point of the law is you cannot treat disabled employees the same as a non-disabled employee. Can we get back to the e-mails? Yes. Why can't the employer take a position saying, look, we've got a bunch of employees who are upset. Now, we don't think she's a threat. We really don't think that she's going to come in with a gun. But we have a team here. That's a big concept with this company. And our team members have this perception that they're afraid. And, you know, there have been incidents, people walking in to work with a gun and shooting fellow employees. And, you know, maybe our employees are overreacting and probably overreacting. And maybe they don't mean what they say. But we do have this avalanche of e-mails that tells us our team is being disrupted. You can't do that, Your Honor, any more than if the e-mails were in response to the person's ethnicity, race, or disability. The fact of the matter is that's exactly what the disability laws are designed to prevent. It would be the same as an HIV case or the case the Supreme Court decided in the Arlen case with tuberculosis. The Supreme Court wouldn't have held that you have to show the direct threat to avoid stereotype, fear, and myth. The fact of the matter is mental disabilities in particular are highly stigmatized. And the very overreaction of these employees was tied to the fact that they knew that she had been hospitalized. And they were told this in violation of our client's right to disability privacy and in violation of the law. And you saw through the e-mails, she'll be returning once she's properly medicated. And so, in fact, that is exactly the kind of illegal fears that the disability laws say that the employer cannot rely on. And it would be no different if it were race, Your Honor. They can't be afraid. You can't ban an employee based on co-worker fear. The Rod case involving an Arab-American, this court decided, is very similar. We can't say that, oh, well, we're afraid of all Arab people. Even though it's an overreaction, we have to exclude you from the workplace. Well, it's no different with a psychological disability. And this case, again, is unusual, where the company admitted in an interrogatory that they relied on this. So your complaint is a failure to give the instruction. I have two complaints, Your Honor. One is given that the only sworn testimony was that they relied in substantial part upon the fears of co-workers, that establishes an illegal reason with a substantial factor, and that establishes disability discrimination as a matter of law. We filed a Rule 50 motion. If the court agrees that there was some evidence of direct threat, then the court has to remand and there needed to be an instruction. That instruction seems to me the instruction that the defendant can request if it relies on that as a reason. It's not something there to – for the benefit of plaintiff. It is there to give the defendant a chance to argue to the jury that this was a legitimate basis in the threat of – Your Honor, they did rely on it. I don't see how you can – how you can ask for instruction that speaks in terms of a defense. Because – They choose not to raise. Because they did raise it. They just didn't call it that. They repeatedly brought in testimony. But they don't get the instruction. They don't get entitled – they don't get entitled to have the jury instructed. By missing the instruction, the jury could have thought, and in fact would have thought, that you can exclude someone from the workplace based on fear, based on misconduct that is related to the disability. What the jury wouldn't understand is it's not enough that this person – that this person has to have a high probability of substantial harm. The jury simply didn't get the picture of what belies. It doesn't matter whose burden it was. Maybe there's some other instruction you could have asked for. I'm sorry? Maybe there's some other instruction you could have asked for, and I forgot. But the one you chose was purely defense instruction. But you have another instruction problem or point that you were going to raise. Well, yes. I mean, there's a number of them. And as I said, Your Honor, I think the law is clear. For example, under Washington law, the same issue came up about reasonable accommodation and undue hardship. And the whole issue came up there in the Washington court of appeals. And the plaintiff said you should have given the undue hardship instruction along with reasonable accommodation because you only got half the story. And the court of appeals said that's right. Even though it's technically perhaps an affirmative defense, it only gave half the story. That's what we have here. Again, the no misconduct – the judge refused to give our instruction that says misconduct is not a separate basis for termination. And that is clearly what Washington law holds. Which of the Washington cases are you relying on for the estimator law argument? It is Mackey which says that it is a different burden of proof than under either 1980 or any of the federal laws. I'm having trouble because I'm asking which one. Yes. It's Mackey that establishes a substantial factor alone violates the law and there is no same-action defense. And so once we prove a substantial factor which is admitted in the interrogatory, we win. There were several other, again, instructional errors. First of all, the undue hardship instruction compounded the lack of direct threat instruction. It allowed the jury to find that as long as Ms. Gambini's presence in the workplace posed an undue hardship, the company could legitimately terminate her. Well, that isn't the law. Undue hardship is a much lower burden of proof than direct threat. That's why the instruction was necessary. Is that the law establishes you cannot remove an employee unless a direct threat is shown. It was not shown here. None of the evidence we believe, even taken in the light most favorable, shows a direct threat. And that's why it was simply discrimination. This was not their theory. They relied on the violation of their policy. But that was our theory. Our theory was they removed her because they perceived her as a threat. Because it was our theory, we were entitled to the instruction. The fact that it's the instruction that says they win and they can show it's a threat? No. Is that an employer What was the text of the actual instruction? We took the instruction directly from our language, the U.S. Supreme Court case. What is the text of that instruction, of the proposed instruction? There's several of them, but the one is on page 41 of the record. It's plaintiff's proposed instruction 30. An employer may discharge a disabled employee who poses a direct threat to the health or safety of others that cannot be eliminated by a reasonable accommodation. A direct threat means a significant risk, one with a high probability of substantial harm as opposed to merely a slightly increased risk. That is what the Supreme Court told us in Arlen is the employer This instruction says this is a basis that they can legitimately discharge her. And they don't rely on this reason. I don't see how you can ask for an instruction whose point is to have them to allow a defense for the defendant when the defendant is not raising that as a defense. They did raise it. They, in fact, submitted a direct threat instruction, which the Court rejected. And so, in fact, that was exactly how they argued the case. Maybe they have a cross-appeal on that. But, Your Honor, the point is if our theory is that it's race discrimination and then the defense says, no, that's not really our theory anymore, and then we should still be entitled to it because our theory is this is exactly what happened. They removed her because of the fear of the coworkers. You might have a subterfuge instruction. You might be entitled to say, you know, they say it's a violation of the rules, but really what they are doing is it's subterfuge for something else. But you're not. I can't imagine how you're entitled to an instruction that's designed to instruct on the defense that they choose not to raise. They did raise it, Your Honor. They ran away from it. Let me see if I understand your position. Yes. Are you saying that if the jury were to credit the testimony that you offer, they were acting on the basis of a direct threat, and that, therefore, you're entitled to a direct threat instruction? Is that essentially what you're saying? So show what they offered. They removed her because they claimed that she had violated the workplace violence. That is in their answer. You can only remove someone for workplace violence if and only if they are a direct threat. And so you're saying that because that's how you believe the jury could view the evidence, that you want an instruction consistent with that? That is correct, Your Honor. Okay. But not just an instruction consistent with it, because you're saying that that's a sufficient reason that if they do it for that reason, they win. No. We all want it. An employer may discharge a disabled employee. It doesn't say anything about where you may not discharge. It just says it may discharge a disabled employee who poses a direct threat to the health and safety of others that cannot be eliminated by a reasonable accommodation. If I had written the instruction the other way, I don't think it would make a difference. An employer may not discharge an employee unless they pose a direct threat. That was what our intent was, and I think it says the same thing. If you had posed that instruction to the judge, then you'd have something to argue about. I don't think there's a substantive difference, Your Honor, between writing it in the negative or in the positive. Again, let me just get to some other instructions. The FMLA instructions were also erroneous. They gave the instructions for a case involving motive. We just had a strict substantive interference claim. The law is clear that in that case, we all we have to establish is entitlement to the right. Then the burden shifts to them to prove a reason separate from the FMLA. Instead, they gave an A negative factor instruction, which is incorrect. And so, again, that's another jury instruction error. I thought you were going to argue instruction, propose instruction 26. Oh, I'm sorry. I thought I mentioned that. I did say that, the conduct instruction. I mentioned that earlier. Only vaguely. This is your best claim, and you're down to a minute and 34 seconds, and you haven't said anything about it. I mentioned that very early, Your Honor, is that that is a fundamental provision of Washington law, is that conduct resulting from a disability is part of the disability and not a separate basis for termination. Do you want to save your time for rebuttal? No, I have one minute left, Your Honor, I guess. Yeah. But anyway, I raised it. Why don't we hear from the employee? You finally made the point, so let's see what the employee has to say about that one. That sounds like a good argument to me. What do you have to say about that? Shall I introduce myself first? If you wish. My name is Pam DeBette. I'm here on behalf of DeVita, the employer. And if you could tell me what... In section 26, this is on page 39 of the excerpt's record, why weren't they entitled to that instruction? I mean, they were specifically asked, and this suggests there's no, no, no, and then he starts going off and talking about kleptomaniacs. We're talking about conduct resulting from a disability is part of the disability, and, okay. The reason that they're not entitled to that instruction, Your Honor, is that it's not supported by the law or the facts. And so... Not supported by the law. Which law is it that you're relying on that says it's not supported by the law? That's right. It's not supported by the law. The law in our state is that if someone... It's under the Roeber case, and it holds that someone who is perceived to have misbehaved in violation of the workplace violence policy can be terminated even if they claim that their misconduct is based on a disability. This case is very similar to the Roeber case, and it is... I have the Roeber case here. Pardon me? I have the Roeber case here. Do you want to tell me where in the Roeber they say this? Where in Roeber do they say this? Well, it's cited at length in my brief, and... Well, then you should have no trouble finding it. Okay. Let's flip to Roeber and read it together, because I'm a little surprised by your statement, too. In the first place, Your Honor, the plaintiff has cited this case, the real case, incorrectly. They quote saying what the real case actually said was conduct resulting from the... I'm sorry, we're no longer on Roeber? Okay. You changed cases on me? I did change cases on you. Okay. And real as in R-I-E-H-L, not R-E-A-L. That's right. Okay. Let me flip to that one, because I happen to have that one, too, with me. Okay. I am with you. Where does real speak to this issue? All right. Real says conduct resulting from the disability on page one. Where does it say that? 152 in the Washington. You know, my 152, I have pages starting with 900. I can find 152. Okay. Look at page 36 of the red brief. She quotes the sentence. Well, but I prefer to look at the case itself. You can never tell what they leave out in briefs. Well, it runs against what she said, but in any event, doesn't it say in the part that you quote that says conduct resulting from the disability is part of the disability and not a separate basis for termination? And what you're emphasizing is a parenthetical that says E-G, decrease in performance. That's true. What I'm saying is that, for example. What does E-G stand for? For example. I don't know the Latin. That's not exclusive, right? That's true. It says generally that conduct resulting from the disability is part of the disability. And that's what counsel's argued to us. And you say that's not supported by the law. I think that it's not supported by the law in this case because counsel's going too far. And we have Washington precedent that says that, you know. And I can give you the citation to that now. That's in the Rover case. Well, I found this part of the case that Shayla was referring to. And it says right there. Yeah. It's in black and white in the case. It sounds to me consistent with exactly what's proposed during section 26. Now, you said there's more law that helps you? There is. One of them is REAL itself. Well, how does REAL help you? REAL seems to cut the heart out of your argument. Well, REAL refers to the Rover case. And it doesn't make any sort of distinction that would say that the Rover case is wrong. Now that we've made this pronunciation, this is wrong. The REAL case. I'm sorry? The REAL case cites to the Rover case. Where does it cite to the Rover case? It's at 150 of the REAL opinion. 150? On a different point? Yes. On a different point. Okay. So why do we care that it's cited for a different point? Pardon me? Why do we care if REAL cites the Rover on a different point? Because we know that the Washington Supreme Court had that case before it when it was making this decision on REAL. And it did not have to – it didn't say anything about, well, in the Rover case, that would mean that that would be overruled. It doesn't overrule the Rover case in any way. Overruled by inference? By not having referred to it for the point on which REAL made a specific statement? Is that the argument? Let me say that there are other cases that also take the position that I'm taking now that it's not only – Well, REAL is a Washington Supreme Court case, right? Yes. Okay. From 2004, which is not so many years ago. That's not so many years ago. Okay. Do you have a more recent case from the Washington Supreme Court that says something other? I don't have one. Okay. So then the latest pronouncement from the Washington Supreme Court seems to almost verbatim adopt a theory of the law that incorporates instruction, Proposed Instruction 26. That is true. Okay. Why isn't that error, per se, for the district judge to have refused to give that instruction? The judge can refuse to give an instruction. He doesn't have to give all the proposed instructions at all. He has the discretion to formulate the instructions. He has discretion, but my two colleagues who are district judges or were district judges will correct me on this if I'm wrong, but would not have discretion to deny an instruction that goes to the heart of a party's case. And this seems to me goes to the heart of Ms. Gambini's case. The reason? She says, I was fired for acting up. The acting up is part and parcel of my disability. Since they admit that they fired me for acting up, in fact, that's the entire case, okay, they have to show that they could not accommodate. They have to show a business necessity to fire me for this one acting up episode. It seems to me this instruction 26 very nicely packages the law and explains that the acting up is not any different disability. It's just a manifestation of disability. It is as if you had somebody without legs and they had to use a wheelchair, and you say, oh, we're not discriminating them because they're using a wheelchair, because they don't have legs. We are discriminating against them because wheelchairs are noisy or, you know, whatever. I mean, it collapses the conduct and the disability into one, which seems to me the heart of Gambini's case. Well, let me tell you that the ‑‑ And I do not believe district judges are entitled to have discretion to refuse to give an instruction that goes to the heart. They do have discretion to refuse an instruction when it's not supported by the evidence, Your Honor, and that is exactly why this judge refused to give it. The court is not convinced, he wrote, that the jury was required to conclude that the July incident was in fact a manifestation of bipolar disorder. I saw that statement, and I thought he must be kidding. No, Your Honor, there is no ‑‑ The test is not whether the jury is required to reach that conclusion. The test is whether the jury may permissibly reach that conclusion. If the jury were required to reach that conclusion, you would not have an instruction. You would simply have a stipulation, or you would take the issue away from the jury, because anything the jury must conclude then becomes something that is taken away from them, because it can only come out one way. So the judge, charitably speaking, was either being imprecise or just wasn't thinking straight that day when he said that. Well, having a temper isn't ‑‑ it's not unique to bipolar disorder. It's not necessarily that she had a bipolar episode that day. She lost her temper and yelled at someone she hated. That doesn't require a disability. But the jury could find that she did it because of her disability. Well, that is exactly where the third element of the termination claim comes in, the third element of the termination claim instruction. No, I was just going to say, the jury could permissibly have found otherwise than your position, right? And once the answer is the jury could permissibly do it, that's the point at which an instruction is given that sort of sets the framework. I've always thought about jury instructions as creating a kind of latticework on which opposing counsel can mount their arguments. And essentially, to deprive the jury of an integral part of that latticework seems to me to be violating the district judge's responsibility. We call that abuse of discretion. I don't agree with you that it was an abuse of discretion. I believe that. You know, it's not so important that you agree with us. That's true. The important thing is for you to persuade us that we are mistaken in this. So your personal disagreement is, although interesting, is really not particularly persuasive. Why are we wrong on this? I mean, why am I wrong? And I infer from Judge Schader's question that he may have the same view. Why, if this reflects our view, why is that not exactly what goes? I'll try to answer your question. You're entitled to go to the jury and say, look, the judge has instructed you, the judge has instructed you that when she acts up, if you find that the acting up is not just because she was, you know, sort of lost her temper the way a normal person would, but because she had problems with medication, because she had this medical condition, you can conclude that this is firing her for her disability. This is an argument counsel couldn't make because she didn't have the instruction. Actually, that's not true. Counsel went ahead and made the arguments. Well, it's not as effective without an instruction. It doesn't really help. You can sort of tell the jury to do it, and they go back there and they say, but the judge didn't say we could do that. All right. You know what jurors do. Your Honor, I pulled this from the appendix that appellant submitted. It's the EEOC guidelines. And on page 18 of 32, it says, question number 30, may an employer discipline an individual with a disability for violating a workplace conduct standard if the misconduct resulted from a disability? Answer, yes, provided that the workplace conduct standard is job-related for the position in question and is consistent with business necessity. This is Washington law, is it not? Yes. In some respects they draw on EEOC, but in other respects they don't. In other respects, as I read the briefs in this, they go beyond what might be Federal law. So do we regard an EEOC internal regulation as somehow controlling on Washington law? Well, I'm sorry, I should say that we're looking outside of the jurisdiction because the Supreme Court hasn't actually stated that misconduct based on a disability is the disability itself and, therefore, not a separate reason for the termination. So this is persuasive authority at best. That's true. But it doesn't help you any because you look at the last two words that you read. Go ahead, read it again. The business necessity. Did you provide a business necessity defense here? Did you get a business necessity instruction? We didn't give those instructions. So what does that help you? It doesn't say you can fire somebody if they have misconduct as well as a disability, period. It says if you show a business necessity. There was no business necessity defense here. You didn't say, well, if we let her get away with this one temper tantrum, our teams will collapse and our confidence in our leadership will collapse and our business will not go forward. There was nothing of the sort. That thing that you're citing hurts you, actually undermines your case. It doesn't. Because it's as far as it is persuasive and applies to Washington law, what it suggests is that you can only do it if you show a business defense. No, Your Honor. It goes on to say. Which you didn't choose to show. All right. We've put before the Court six other circuit cases that analyzed situations similar to this one and affirmed summary judgment in favor of the employer. They didn't apply Washington law, did they? They did not apply Washington law. That's true. But they did apply this in three different places under the analytical framework and fine for the employer. One is that the plaintiff isn't qualified for the job because she can't keep herself from having these explosive episodes in the workplace. I'm sorry? That's one of the reasons that the other circuits have affirmed and have found for the employer. Did you show that even here? I mean, that sounds to me like business defense. Yes, Your Honor. No, in this case. Was there a showing of repeated outbursts? Just one outburst. In how many years did you? That's enough, Your Honor. That is enough. One outburst is plenty. Would you want to have to support that outburst yourself if an employee of yours came to you with that? Well, that's a very good rhetorical question. And the answer is when the law requires it, we do things that we may not prefer to do. And that's just the way our world works. You know, we have laws, and they apply to you, and they apply to me, and they apply to my colleagues, and they apply to everybody. And sometimes they require us to do things that we would prefer not to do. It is a much easier world for those of us who are not disabled to only deal with people who are full-bodied and fully enabled. It's a reality. I mean, you know, it's easier. But that's not what the law is. It's also not a compassionate thing, but we're not required by law to have compassion. But we are required by law to accommodate. That's the law in Washington State. That's the law in the federal government. And the fact that we might not like it is not a good argument. It's not persuasive. Anything further? Yes, Your Honor. The other cases have also found that this sort of behavior is a legitimate reason for discrimination for the legitimate nondiscriminatory reason for termination. I think you had it right the first time. I'm in the third. You know, I think we've had enough. Thank you. The case is argued. We'll stay a minute. You might take advantage of our mediator in this case, you know, because retrying this case is going to be costly for everybody. Pardon me? You might try our mediator. We have an excellent mediator. We talked to our clerk. And you might think about settling this case because it's not – I don't think it's going to end at the same time. It's my prediction. Be sure to not leave without talking to our deputy clerk about the excellent mediation service we provide.
judges: Goodwin, Kozinski, Shadur